SO ORDERED.

SIGNED this 27th day of June, 2016.



_Dale L. Somers_
Dale L. Somers
United States Bankruptcy Judge

_____

**Opinion Designated for Electronic Use, But Not for Print Publication**
**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

**In re:**

**JIMMY NGUYEN,**
**TIFFANY LUU,**

**CASE NO. 15-12413-7**
**CHAPTER 7**

**DEBTORS.**

## OPINION GRANTING CREDITOR'S MOTION TO DISMISS UNDER § 707(b)

This matter came before the Court on April 5, 2016, for a trial on creditor Security

State Bank's motion to dismiss under § 707(b). The Debtors appeared by counsel Hoa

Alec Nguyen, but did not appear in person. The Bank appeared by counsel Martin J.

Peck. Chapter 7 Trustee Darcy D. Williamson appeared on her own behalf, and Assistant

U.S. Trustee Richard A. Wieland appeared on behalf of the U.S. Trustee's Office. The

Court received evidence and heard the arguments of counsel, and took the matter under

advisement.

Although the Debtors submitted forms asserting they had no income for the six months before they filed their Chapter 7 bankruptcy petition, payment advices they filed show that Debtor Jimmy Nguyen actually had gross pay of more than $10,000 per month during that period. That income placed the Debtors well above the median for a family of two like theirs in the State of Kansas for 2015. The total of the Debtors' consumer debts was nearly double the total of their business debts, making them subject to the abuse standard imposed by § 707(b) of the Bankruptcy Code on debtors with primarily consumer debts. A correctly-completed Form B-122-A would show that the presumption of abuse arose in this case. The Debtors essentially asserted three defenses in an effort to avoid or overcome that presumption: (1) they paid off their home mortgage by selling their home shortly after the trial on the Bank's motion to dismiss and that made their consumer debts less than their business debts, so they should no longer be subject to the abuse test of § 707(b); (2) Mr. Nguyen quit his job on October 16, 2015, and did not obtain a new job until November 16, 2015, and the resulting 30-day loss of income constitutes a "special circumstance" rebutting the presumption of abuse; and (3) Mr. Nguyen suffers medical problems that create uninsured expenses that are so great that the presumption of abuse is rebutted. After considering the evidence and counsel's arguments, the Court concludes (1) the home sale came too late to change the Debtors' status as individuals who owe primarily consumer debts, (2) because Mr. Nguyen obtained a new job so soon after quitting the one he held during the six months before the Debtors filed bankruptcy and that job is paying him as much as he was making at his old

2

job, any interruption in income that the Debtors suffered was too brief to qualify as a special circumstance that could overcome the presumption of abuse that arose in this case, and (3) the Debtors failed to present sufficient evidence to show that Mr. Nguyen's medical problems constitute a serious medical condition that could overcome the presumption of abuse.

**Facts**

With the help of an attorney, the Debtors filed a Chapter 7 petition on November 11, 2015. They reported owing debts totaling approximately $759,800. The Debtors had operated a restaurant until January 31, 2015, and some of their debts had been incurred in connection with that business. At the meeting of their creditors, the Debtors testified that $237,645 of their debts arose from the business and that $522,136 were personal consumer debts not related to the business. They reported owing $429,515 on their home mortgage, and identified that as a consumer debt. On their Schedule A, they listed the home mortgage as a joint debt.[1] Consequently, at that time, their debts were "primarily consumer debts," making them subject to § 707(b).

Along with the Debtors' petition, their attorney prepared and filed on their behalf an Official Form 22A-1 showing that their average monthly income for the six months

---

[1]At trial, the Chapter 7 Trustee suggested there was a question whether Ms. Luu was liable for the debt secured by the home because, although Ms. Luu had signed the mortgage, there had been a loan modification agreement that only Mr. Nguyen signed. The Debtors did not assert any argument based on this possibility, and the modification agreement was not offered into evidence and has not been otherwise presented to the Court. The Debtors also did not assert any argument that Ms. Luu should be treated differently than Mr. Nguyen under § 707(b) because she herself has no income.

3

before they filed bankruptcy (their "current monthly income" as defined in § 101(10A)) was $0, which would have put them well below the $60,577 that was the median annual family income for a household of two (like theirs) in Kansas. Nevertheless, two days later, the attorney filed copies of payment advices showing that Mr. Nguyen had been paid by HollyFrontier Payroll Services during the six months ending in October 2015, with paychecks dated June 30, July 14, July 28, August 11, August 25, and September 8. In fact, the year-to-date figures on the June 30 pay stub show that Mr. Nguyen had been paid nearly the same amount every two weeks during 2015 from January through June 30. While testifying at the meeting of creditors, Mr. Nguyen confirmed that he had been employed by HollyFrontier throughout 2015, receiving a small pay increase early in the year and being paid the new amount every two weeks, until he quit his job on October 16. Furthermore, the Bank's records show it also received money garnished from Mr. Nguyen's November 3 and November 17 paychecks, indicating he continued to be paid for a time after he quit. In fact, the November 17 garnishment obtained almost twice as much as the Bank's earlier garnishments, indicating Mr. Nguyen's pay had increased for that check, perhaps to pay him for vacation or sick leave he had not used before he quit working for HollyFrontier.

The meeting of the Debtors' creditors pursuant to § 341(a) was held on February 8, 2016. During that meeting, the Debtors explained that they had moved to the State of Washington because Mr. Nguyen obtained a new job there. He had started work on November 16, 2015, so Mr. Nguyen's unemployment lasted only for a month. He was

4

being paid approximately the same amount he had been earning at HollyFrontier, about $130,000 per year. When asked about the status of the Debtors' Wichita home, Mr. Nguyen reported that they had listed it for sale with a local realty company and were asking $485,000 for it. At the creditors' meeting, he did not mention any possibility that his new employer might be arranging a sale of the home for the Debtors because the employer was relocating them to Washington. On February 11, the Bank's motion to dismiss came up on a docket and was set for an evidentiary hearing on April 5, and there was still no mention of any sale of the Debtors' home through Mr. Nguyen's employer.[2]

At trial, the Debtors offered into evidence a copy of a contract to sell their home to a company called RELO Direct, Inc., that indicated the sale was being made because the Debtors were being relocated by Mr. Nguyen's new employer. The Bank objected because the proferred copy had not been signed by either the Debtors or the buyer. The Court decided to keep the record open for 30 days to permit the Debtors to submit a signed copy of the contract. During that time, the Debtors submitted a copy showing they had signed the contract the day before the trial, but the buyer did not sign it until April 14, nine days after the trial.

At the meeting of creditors, Mr. Nguyen testified he had missed perhaps as much as 30 days of work during 2015 because of illness. He said he was in and out of both the doctor's office and the hospital during that year. He also said the stress of having no

_____

[2]On February 29, 2016, the mortgage holder had obtained relief from stay to allow it to exercise its rights against the Debtors' home, but the subsequent sale of the home presumably paid off the mortgage and eliminated any need to pursue legal action against it.

5

money to pay bills had caused his work for HollyFrontier to "go down" and he became

afraid the company would let him go, so he quit before they decided to do that. Mr.

Nguyen added, however, that the Debtors' move to Washington for his new job had

improved their financial situation because the Bank was not garnishing his wages there.

At trial, the Debtors' attorney offered some of Mr. Nguyen's medical records, and

the Bank objected that (1) the records were hearsay, and (2) they were not relevant

without an explanation of what effect Mr. Nguyen's medical condition would have on his

ongoing ability to have income. The Court ruled the records had not been shown to be

admissible. The Debtors' attorney also offered a letter Mr. Nguyen had sent to the

Chapter 7 Trustee which included assertions about his medical problems, but the Bank

objected to its admission on the ground it was hearsay and Mr. Nguyen was not available

to be cross-examined. The Court sustained that objection. Consequently, there is

insufficient evidence before the Court to show that Mr. Nguyen's medical problems will

either limit his ability to continue to earn the income he is being paid by his new

employer or generate excessive medical expenses for the Debtors.

**Discussion**

**A. The statute on which the Bank bases its motion to dismiss, § 707(b).**

Before the Bankruptcy Abuse Prevention and Consumer Protection Act

(BAPCPA)[3] took effect in 2005, § 707(b) authorized bankruptcy courts to dismiss a

---

[3]Pub. L. 109-8, 119 Stat. 23 (Apr. 20, 2005).

6

Chapter 7 case filed by "an individual debtor with primarily consumer debts" if granting

relief to the debtor "would be a substantial abuse of the provisions" of Chapter 7.[4]  There

was a presumption, however, in favor of granting the relief the debtor sought.[5]  The

BAPCPA dramatically modified § 707(b).  As relevant here, in subsection (b)(1),

Congress reduced the standard for dismissal from "substantial abuse" to "abuse," and

eliminated the presumption in favor of granting the debtor relief.  Next, in subsection

(b)(2), Congress created a detailed and complicated mathematical test for evaluating the

income and expenses of debtors with monthly income above a certain threshold to

determine whether a presumption of abuse would arise.  This is commonly known as the

means test.  When that test raises a presumption of abuse, the case must be dismissed or

converted to Chapter 13 unless the debtor can show "special circumstances" that

overcome the presumption.

**B.  Should the Court treat the Debtors as having "primarily consumer debts" even though they sold their home shortly after the trial on the motion to dismiss?**

As indicated, a short time after the trial on the Bank's motion to dismiss, the

Debtors sold their home, eliminating the home mortgage that constituted roughly 80% of

their consumer debts.  Because the amount of their remaining consumer debts is

substantially less than the amount of their business debts, they suggest they should no

longer be subject to the § 707(b) standard for individuals whose debts are primarily

---

[4]11 U.S.C.A. § 707(b) (Thomson West 2004).

[5]*Id.*

7

consumer debts.  They cited no case involving a similar postpetition change in the

composition of a debtor's debts, and the Court has found none.  In any event, under the

circumstances of this case, the Court concludes that the change in the Debtors' debt

composition came too late.  Even if the Debtors' status as owing primarily consumer

debts was not fixed as of the day they filed their bankruptcy petition, this change after the

Court held a trial on the Bank's motion to dismiss doesn't change the facts that the parties

relied on in litigating that motion.

> A leading bankruptcy treatise says:

> > A motion to dismiss under Code § 707(b) is generally based upon
> > facts that exist at the time the case is commenced and that usually can be
> > discovered early in the case through review of the debtor's schedules and
> > examination of the debtor at the first meeting of creditors.  Based on this,
> > bankruptcy Rule 1017(e) imposes a 60-day time limit for bringing a motion
> > to dismiss under Code § 707(b).  Because dismissal for abuse effectively
> > denies the debtor a Chapter 7 discharge based on matters which can be
> > discovered early in the case, the motion to dismiss under § 707(b) is
> > analogous to an objection to discharge which must be filed within the same
> > 60-day time period.[6]

The meeting of creditors pursuant to § 341(a) was first set in this case for December 14,

2015, making the deadline for filing a motion to dismiss under § 707(b) for abuse

February 12, 2016.  Because the Bank was required to bring its motion to dismiss under

§ 707(b) by that date, necessarily relying on the facts that existed before the deadline

expired, it would not be appropriate to immunize the Debtors from the Bank's abuse

claim under § 707(b) because the composition of their debts changed more than two

---

[6]William L. Norton, Jr., and William L. Norton III, 4 *Norton Bankruptcy Law & Practice*, § 79:9
at 79-25 (3d ed. 2015).

months after that deadline.

Furthermore, § 707(a) authorizes the dismissal of any Chapter 7 case, no matter what types of debts the debtor owes, for "cause." Courts have held that a debtor's substantial financial means or ability to repay creditors can be considered but cannot by itself constitute cause for dismissal under that provision.[7] The Bank could have relied on Mr. Nguyen's substantial earning capacity as an important factor suggesting the Debtors' case should be dismissed for cause under § 707(a), but it had no reason to pursue a for-cause dismissal since the composition of the Debtors' debts at the time of trial showed that they were subject to the presumption of abuse under § 707(b).

For these reasons, the Court concludes the Debtors must be treated as "individual[s] . . . whose debts are primarily consumer debts" even though the post-trial sale of their home eliminated the major debt that made the amount of their consumer debts exceed the amount of their business debts.

## C. The presumption of abuse arose in this case.

The Debtors filed a Form 22A-1 that incorrectly showed their average monthly income for the six months before they filed bankruptcy was zero and they were therefore not subject to the abuse standard of § 707(b). The Bank completed a new Form 122A-1[8]

---

[7] *See In re Quinn*, 490 B.R. 607, 617 (Bankr. D.N.M. 2012) (*citing Smith v. Geltzer*, 507 F.3d 64, 74 (2d Cir. 2007), and *Perlin v. Hitachi Capital America Corp.*, 497 F.3d 364, 374 (3d Cir. 2007), along with lower court decisions).

[8] Although the Debtors filed their case before the new forms became effective on December 1, 2015, the Court is not aware of any relevant substantive change they made to the prior forms. In addition, at trial, the Debtors did not complain about the Bank's use of the new forms instead of those in effect on

based on the payment advices the Debtors supplied.  According to those, the Debtors'

average monthly income for the six months before they filed bankruptcy was $10,799.08,

or an annual income of $129,588.90.  At trial, the Debtors did not question this figure.

Because a "currently monthly income" of $0 placed the Debtors below the median

income for a family of two in Kansas, they did not complete a Form 22A-2 that would

show whether their average monthly income exceeded their allowable monthly expenses

under the means test and, if so, by how much.  The Bank relied on new Form 122A-2 to

calculate the maximum possible expenses the Debtors could claim under the means test,

and asserted the standards applicable in Kansas would allow them expenses of $8,311 per

month, and those applicable in their new Washington home would allow them $9,188 per

month, giving them monthly disposable income of $2,488 or $1,611.  The mechanical

means test, the Bank claimed, therefore leads to the conclusion that over a 60-month

Chapter 13 plan, they could pay $149,280 under the Kansas standards or $96,660 under

the Washington standards.  The Debtors did not question the Bank's calculations on this

point, either.  Consequently, the Court accepts the Bank's calculations for Forms 122A-1

and 122A-2 as accurate.

According to the Debtors' Schedule F, their nonpriority unsecured claims totaled

$158,622; twenty-five percent of that amount is $39,655.50.  Under § 707(b)(2)A)(i)(I)

and (II), the Court is to presume abuse exists if the difference between the Debtors'

---

the day they filed their petition.

current monthly income and their allowable expenses, multiplied by 60, exceeds the

lesser of $39,655.50 or $12,475.  The calculations the Bank made show the Debtors could

pay much more than $12,475 under either the Kansas or the Washington expense

standards.  In effect, then, the Debtors admitted at trial that the presumption of abuse of

the provisions of Chapter 7 arose in their case.  Besides claiming they should not be

subject to the means test at all, the Debtors sought to avoid the dismissal of their case

only on the grounds that special circumstances existed to rebut the presumption.

**D.  What does "special circumstances" mean?**

In § 707(b)(2)(B)(i), the Bankruptcy Code addresses the "special circumstances"

that can rebut the presumption of abuse:

> (B)(i)  In any proceeding brought under this subsection, the
> presumption of abuse may only be rebutted by demonstrating special
> circumstances, such as a serious medical condition or a call or order to
> active duty in the Armed Forces, to the extent such special circumstances
> . . .[9] justify additional expenses or adjustments of current monthly income
> for which there is no reasonable alternative.

A debtor seeking to establish special circumstances must comply with the procedural

requirements of § 707(b)(2)(B)(ii) and (iii).  These subsections require the debtor to

itemize and document each additional expense or adjustment to income, explain in detail

why it is necessary and reasonable, and attest under oath to the accuracy of any

supporting information provided.  In this case, the Debtors did not comply with these

requirements, so their defenses could be rejected on that basis.  However, as explained

---

[9]The Court has omitted a "that" at this spot because it appears to be a drafting error.

below, their defenses fail on substantive grounds as well.

The phrase "special circumstances" is not defined in the Bankruptcy Code. The Court finds the phrase to be open-ended. For example, it could refer to the circumstances that caused the debtor to incur an expense, to the reasons for a debtor's financial circumstances at the time of filing, to the debtor's anticipated financial circumstances, or to the consequences of the debtor's filing for bankruptcy relief. The Court will therefore consider the purpose of the provision, as reflected in the legislative history,[10] and the decisions of other courts.

The legislative history of the BAPCPA establishes that the concept of "special circumstances" was first introduced to the means test in 1999 in Senate Bill 625.[11] The Senate Judiciary Report on that bill identified a bankruptcy crisis arising from a record number of filings in 1998, following three consecutive years of increased filings even though consumer confidence and wages were high and unemployment was low. The need for congressional action was found in "the existence of multibillion dollar losses attributable to bankrupts who could repay their debts."[12] The recommended solution was a rebuttable presumption of abuse based on the means test.

It is the strong view of the Committee that the bankruptcy code's

---

[10]*Burlington N. R.R. Co. v. Oklahoma Tax Comm'n*, 481 U.S. 454, 461 (1987) ("Legislative history can be a legitimate guide to a statutory purpose obscured by ambiguity."); *In re Delbecq*, 368 B.R. 754, 756-58 (Bankr. S.D. Ind. 2007) (examining legislative history of § 707(b)(2)(B)).

[11]*Delbecq*, 368 B.R. at 757.

[12]S. Rep. 106-49 at 2 (1999) (available on Westlaw at 1999 WL 300934).

12

generous, no-questions-asked policy of providing complete debt forgiveness under chapter 7 without serious consideration of a bankrupt's ability to repay is deeply flawed and encourages a lack of personal responsibility.

        S. 625 responds to the bankruptcy crisis by amending section 707(b) of the bankruptcy code to require bankruptcy judges to dismiss a chapter 7 case, or convert a chapter 7 case to chapter 13 if a bankrupt has a demonstrable capacity to repay his or her debts. Under S. 625, a presumption arises that a chapter 7 bankrupt should be dismissed from bankruptcy or converted to chapter 13 if, after taking into account secured debts and priority debts like child support as well as living expenses, the bankrupt can repay 25 percent or more of his or her general unsecured debts, or $15,000, over a 5-year period. The bankrupt can rebut this presumption by demonstrating "special circumstances" which would show that the bankrupt in fact does not have a meaningful ability to repay his or her debts.[13]

The report further states the following regarding "special circumstances:"

        In order to protect debtors from rigid and arbitrary application of a means-test, section 102 also provides that in some cases where the presumption applies the debtor may be able to demonstrate "special circumstances" that justify additional expenses or an adjustment to the debtor's income. The Committee adopted the "special circumstances" standard, rather than the "extraordinary circumstances" standard included in the Conference Report to accompany H.R. 3150 to provide a different standard of when a debtor may overcome the presumption of abuse.

        In applying the "special circumstances" test, it is important to note that a debtor who requests a special circumstances adjustment is requesting preferential treatment when compared to other consumers, and it is those other consumers who, by paying their debts, must assume the cost of the debts discharged by the debtors seeking the preferential treatment. In order to ensure fairness with respect to the consumers who must pay the cost when others discharge debts in bankruptcy, it is essential that the "special circumstances" test establish a significant, meaningful threshold which a debtor must satisfy in order to receive the preferential treatment. The debtor's ability to overcome the presumption of abuse must be based solely on financial considerations (i.e., adjustments to income or expenses required by special circumstances) and not on factors unrelated to a chapter

---

[13]S. Rep. 106-49 at 3.

7 debtor's ability to repay his or her debts. . . . In addition, special circumstances adjustments must not be used as a convenient way for debtors to choose a more expensive lifestyle. The special circumstances provision must be reserved only for those debtors whose special circumstances require adjustments to income or expenses that place them in dire need of chapter 7 relief.

. . . .

The new section 707(b) thus contains a tightly-focused mechanism for identifying bankrupts who have repayment capacity and sorting them out of chapter 7. At the same time, the new section 707(b) contains numerous procedural safeguards in order to ensure that the individual circumstances of each bankrupt will be considered before he or she is dismissed or converted to chapter 13.[14]

The statutory examples of special circumstances — medical expenses and active service in the military — were added in 2005 by an amendment offered by Senator Sessions.[15] The amendment clarified "that the special circumstances exception to the bill's needs-based test includes a debtor with a serious medical condition or a debtor on active duty in the military to the extent these factors justify adjustment to income or expenses."[16] "According to Senator Sessions, the intent behind the examples was not to limit judicial discretion or to provide a definition of special circumstances, but rather, was to ensure that 'those incapable of paying back their debt due to military service or a serious medical condition may not be required to do so.'"[17]

---

[14]S. Rep. 106-49 at 6-8.

[15]H.R. Rep. 109-31(I) at 9 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 96 (available on Westlaw at 2005 WL 832198); *Delbecq*, 368 B.R. at 758; *In re Haman*, 366 B.R. 307, 314 (Bankr. D. Del. 2007).

[16]H.R. Rep. 109-31(I) at 9.

[17]*Haman*, 366 B.R. at 314 (*quoting* 151 Cong. Rec. S1834 at S1845-46 (Mar. 1, 2005) (statement of Sen. Sessions)).

14

From the foregoing, the Court determines that the presumption of abuse under the means test was adopted to cure the perceived problem of debtors electing to file under Chapter 7 when they had the ability to pay a meaningful portion of their nonpriority unsecured debts, calculated using the objective criteria of the means test and based on their average monthly income during the six months before they filed bankruptcy. "Special circumstances" focuses on financial conditions that justify including additional expenses or reducing average monthly income. The burden to establish special circumstances was not set particularly high, making the presumption truly rebuttable. The standard for making adjustments is special, not extraordinary, circumstances. The procedural requirements impose the conditions that the adjustments to income or expenses be itemized, documented, and explained in detail to show they are necessary and reasonable. The medical expenses and military service circumstances listed in the statute are just examples of circumstances where the results of the means test, based primarily on IRS national and local standards, may not accurately demonstrate an ability to repay. The statutory requirement that there be no reasonable alternative is linked to the concern that the special circumstances rebuttal not be used as a convenient way for Chapter 7 debtors to choose a more expensive lifestyle. The question is whether, given the individual debtor's circumstances, the presumption of abuse has erroneously identified the debtor as having the ability to pay a meaningful portion of his or her unsecured debts.

**E. The short time Mr. Nguyen was unemployed does not constitute special**

15

**circumstances that overcome the presumption of abuse.**

The Debtors contend that Mr. Nguyen's 30-day period of unemployment is sufficient to overcome the presumption of abuse in this case. Although a period of unemployment that occurs after most or all of the six months immediately before a debtor files bankruptcy certainly reduces the debtor's income while the unemployment lasts and suggests the calculation of his or her "current monthly income" might have exaggerated his or her ability to pay debts in the future, such a brief period as Mr. Nguyen experienced cannot be considered to have seriously affected the Debtors' ability to pay a meaningful portion of their unsecured debts. Furthermore, Mr. Nguyen testified at the meeting of creditors that his job performance had "gone down" before he quit his pre-bankruptcy job because of the stress of not having money to pay bills, but the Debtors' move to Washington for his new job had improved their financial situation because the garnishment of his Kansas wages that the Bank had been doing was not occurring there. This indicates the circumstances that led him to quit his job do not exist for the Debtors in Washington. The Debtors' assertion that Mr. Nguyen's brief period of unemployment rebuts the presumption of abuse must fail.

**F. The Debtors failed to present sufficient evidence to show that Mr. Nguyen's medical problems constitute special circumstances that overcome the presumption of abuse.**

At the meeting of the Debtors' creditors, Mr. Nguyen testified that he had missed about 30 days of work during 2015 because of medical problems. But only a very small

16

portion of the unpaid debts the Debtors listed on their bankruptcy schedules — a total of $1,046 being collected by Central States Recovery — appear to be related to those medical problems, so before the Debtors filed bankruptcy, the problems did not generate substantial expenses for them beyond those allowed under the means test. And while Mr. Nguyen missed 30 days of work during 2015, he had vacation and sick leave he used so his absences did not affect the income he received from his job. At trial, the Debtors tried to provide other evidence about Mr. Nguyen's medical condition, but they failed to establish that the documents they proferred were admissible. The evidence that was properly presented at trial is simply not enough to convince the Court that Mr. Nguyen's condition either generates substantial expenses that are not accounted for under the mechanical means test or significantly impairs his ability to earn the high income he was being paid at his old job and is now being paid at his new job. In short, the Debtors have failed to show that Mr. Nguyen's medical problems should overcome the presumption of abuse.

**Conclusion**

The Court concludes that (1) § 707(b) applies to these Debtors, (2) the presumption of abuse arose in this case, and (3) the Debtors have failed to establish the existence of special circumstances that overcome the presumption. The Bank has asked the Court to dismiss the case and not mentioned the possibility of converting it to Chapter 13. The Debtors have not suggested they have any desire to convert the case to Chapter 13. The fact the Debtors have now moved to the State of Washington would also make it

17

more difficult to administer their case from here in Kansas if it were converted.

Consequently, the Court concludes the case should be dismissed.

**Judgment**

For these reasons, judgment is hereby entered dismissing this case. Pursuant to Fed. R. Bankr. P. 9021, this judgment will become effective when it is entered on the docket pursuant to Fed. R. Bankr. P. 5003.

# # #